***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes, and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as a matter of law the following which were entered into by the parties as: *Page 2 
 STIPULATIONS
1. On June 20, 2006 and June 28, 2006, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On those dates, an employment relationship existed between plaintiff and defendant. St. Paul Travelers Insurance Company was the workers compensation insurance carrier on the risk.
3. Plaintiff's average weekly wage shall be calculated by the Commission based upon an accurate Form 22 Wage Chart.
4. The parties stipulated the following exhibits into evidence:
 1. Stipulated Exhibit 1 — Defendants' Hearing Notebook which included the following documents:
 a. Industrial Commission Forms
 b. Medical Records
 c. Plaintiff's Employment Records
 d. Form 22
 e. Job Descriptions
 f. Plaintiff's Responses to Defendants Discovery
 g. Defendants Responses to Plaintiff's Discovery
 h. Recorded Statement
 i. Ergonomic Evaluation
 * * * * * * * * * * * RULING ON MOTION TO RECEIVE ADDITIONAL EVIDENCE
Plaintiff, by letter dated February 14, 2008, has submitted to the Full Commission a *Page 3 
Motion to Receive Additional Evidence in the form of: (1) Plaintiff's 2007 Form W-2 from Johnston County Public Schools and (2) copies of her paycheck stubs from Johnston County Public Schools for 2008. Defendants made no objection to the additional evidence. Thus, the Full Commission, in its discretion, hereby GRANTS plaintiff's motion and admits the above-mentioned evidence into the record of this matter.
 ***********
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. This case originally arises from multiple claims asserted by plaintiff in connection with her employment. Plaintiff alleges that she sustained a compensable back injury on June 20, 2006, and also developed a compensable occupational disease, namely bilateral carpal tunnel syndrome, on June 28, 2006.
2. At all relevant times, plaintiff was employed as a groomer/salon manager for Petsmart. Defendants have denied plaintiff's claims, on the grounds that she did not sustain a compensable injury by accident arising out of and in the course of her employment, and did not develop a compensable occupational disease.
3. Plaintiff claims that on June 20, 2006, she was lifting a large dog when she experienced an immediate onset of low back pain. With respect to the alleged occupational disease, plaintiff initially reported that her complaints of hand/wrist pain arose as a result of her alleged back injury. Plaintiff subsequently amended her allegations, and now contends that she developed her condition as a result of the job duties. *Page 4 
4. Plaintiff first presented to Wake Urgent Care on June 27, 2006, and reported she developed bilateral hand numbness and back pain, as a result of a work injury. The treating physician diagnosed plaintiff with neck pain, lumbar strain, and bilateral hand radiculopathy, and recommended conservative treatment.
5. Plaintiff next presented to Concentra on June 28, 2006, reporting complaints of low back pain and bilateral hand/wrist pain. The physician diagnosed plaintiff with a low back strain and recommended conservative care and referral for orthopedic evaluation.
6. Plaintiff returned to Concentra on July 7, 2006, and subjectively reported "injury on 6/20/06 and the next day she developed onset of tingling in both hands." The treating physician diagnosed plaintiff with cervical radiculopathy, cervical strain and lumbar strain, and recommended conservative treatment. In addition, plaintiff was assigned restrictions of no lifting over 20 pounds.
7. Plaintiff subsequently presented to Raleigh Orthopaedic Clinic on July 11, 2006 for treatment of her carpal tunnel complaints by Dr. Krakauer. Plaintiff reported bilateral hand pain, right greater than left. Plaintiff again reported the onset of her carpal tunnel symptoms on June 20, 2006 while lifting a dog at work. Dr. Krakauer diagnosed plaintiff with bilateral carpal tunnel syndrome, right worse than left, and recommended an EMG for further diagnostic purposes.
8. Plaintiff returned to Raleigh Orthopedic Clinic on August 17, 2006 for treatment of her low back pain with Dr. Nelson. Dr. Nelson reviewed plaintiff's MRI which revealed scoliotic curvature of the spine without any evidence of nerve root impingement or etiology for her alleged radiculopathy. Dr. Nelson diagnosed plaintiff with mechanical low back pain. *Page 5 
9. Plaintiff returned for follow-up with Dr. Krakauer on September 5, 2006 following completion of an EMG. The EMG results revealed mild evidence of carpal tunnel syndrome. Dr. Krakauer recommended plaintiff proceed with carpal tunnel release surgery.
10. Plaintiff returned for treatment with Dr. Nelson on August 21, 2006. Plaintiff's diagnosis remained mechanical low back pain, and she was referred for a course of physical therapy.
11. Plaintiff underwent right carpal tunnel release surgery on September 21, 2006, for what Dr. Krakauer diagnosed as right carpal tunnel syndrome. Plaintiff returned for postoperative treatment with Raleigh Orthopaedic Clinic.
12. Plaintiff returned for final evaluation with Dr. Nelson on October 2, 2006. Physical examination was normal, and Dr. Nelson referred plaintiff for an FCE, and released her according to those restrictions. Plaintiff was released from further treatment with return only as necessary.
13. Plaintiff returned for follow up with Dr. Krakauer on November 7, 2006, and reported significant improvement following surgery. Dr. Krakauer recommended plaintiff proceed with the left carpal tunnel release. Plaintiff presented to Rex Healthcare on November 27, 2006 where she underwent left carpal tunnel release. Plaintiff again received postoperative treatment with Dr. Krakauer.
14. Plaintiff was seen by Dr. Krakauer on February 14, 2007, and reported resolution of her right-sided symptoms, and significant improvement of the left hand/wrist. Dr. Krakauer opined plaintiff was capable of returning to work without restrictions in four weeks. *Page 6 
15. Plaintiff testified that she was hired at Petsmart as a groomer on May 10, 2000. Plaintiff performed that job until promoted to salon manager on June 2, 2000. Plaintiff continued working as the salon manager until her last day of work on June 27, 2006.
16. Plaintiff stated her job duties as salon manager included grooming pets, answering telephones, checking clients into the computer system, training new employees, and attending meetings. Plaintiff's position required numerous job duties other than grooming pets, and as salon manager, she performed less grooming than the pet stylists.
17. Plaintiff estimated that the grooming process takes one to two hours per pet. Plaintiff admitted that she predominantly used the clippers in her right hand for grooming activities and used her left hand to hold the dog steady while trimming the animal. Plaintiff generally groomed seven to eight animals per day. Plaintiff worked a seven to eight hour shift, five days a week, and was provided two 15 minute breaks and a half hour lunch break.
18. Plaintiff estimated that she used the electric clippers approximately four hours per day. However, she admitted that this activity was not continuous, and employees had to stop grooming to answer phones and deal with customers.
19. Plaintiff testified that she was aware of a written policy at Petsmart requiring employees to immediately report all injuries sustained at work. In addition, plaintiff admitted she was informed of this policy at the time she was hired.
20. Plaintiff claimed that her supervisor, Sabrina Kornegay, and a co-worker, Michael Moore, witnessed her injury. She also alleged that she immediately reported the injury to Ms. Kornegay in accordance with Petsmart policy. Ms. Kornegay directly contradicted this testimony. *Page 7 
21. Plaintiff also admitted that she continued working the remainder of her shift, and worked her full-duty job for at least a week before going to the doctor. Plaintiff alleged that she complained to her co-employees all week that she injured her back and had ongoing pain. However, plaintiff's testimony was directly contradicted and is, thus, not supported by the greater weight of the evidence.
22. Plaintiff admitted that from June 20, 2006 — June 27, 2006 she continued working full time performing her normal job duties. Plaintiff's Form 22 revealed that she worked overtime several days during that period.
23. Plaintiff ultimately admitted that she did not seek medical attention until after a disciplinary meeting with her direct supervisors. Plaintiff met with Mr. Folcher and Ms. Kornegay on June 27, 2006 to discuss ongoing disciplinary issues concerning her performance as the salon manager. Plaintiff was informed at that meeting that she would either have to accept a transfer and demotion to pet stylist, or be terminated from further employment with Petsmart. Immediately after her disciplinary meeting plaintiff sought medical treatment and alleged she was injured at work.
24. Tommy Folcher testified that he is employed as the store director (Manager) of the Petsmart Capital Boulevard location. He has held his current position since 2005. He was employed as the store director for that location during the period of plaintiff's employment, and was her direct supervisor.
25. During his shift, employees were required to report any injuries directly to him or the assistant manager, Ms. Kornegay. Petsmart has a written policy requiring immediate reporting of all work injuries. All employees are advised of that policy at the time of hiring. He also handles all disciplinary issues and performance reviews with any of his employees. *Page 8 
26. Plaintiff continued working full-duty in her regular position from June 20, 2006 — June 27, 2006. During that time, he testified that plaintiff never reported the alleged back injury to him, nor did she complain of ongoing back problems. He also stated plaintiff did not exhibit any physical limitations, or appear to be injured.
27. Mr. Folcher testified that on June 27, 2006, he held a disciplinary meeting with plaintiff. The purpose of the meeting was to discuss her performance issues related to complaints by her employees. He testified that plaintiff had been counseled/disciplined for these issues on multiple occasions over the last six months to one year. At the meeting, he and Sabrina Kornegay reviewed the complaints against Ms. Biggerstaff, and instructed her that she had the option of transferring to a different store where she would be demoted to pet stylist, or accepting termination. At the conclusion of the meeting, he requested that Ms. Biggerstaff sign a disciplinary form, which she refused to do. He stated that during the course of the meeting, plaintiff did not report an alleged injury at work, or exhibit any physical limitations.
28. Plaintiff took her lunch break shortly after the meeting, and subsequently called the store, reporting that she was allegedly injured on June 20, 2006. Prior to that time, Mr. Folcher testified he received no notice of plaintiff's alleged work injury.
29. Sabrina Kornegay testified she was previously employed as the operation manager/assistant manager at the Capital Boulevard location where plaintiff was employed. Ms. Kornegay testified she was employed in that capacity from February 2006 — October 2006. During that period, she worked with Ms. Biggerstaff and was plaintiff's direct supervisor.
30. Ms. Kornegay testified that along with Mr. Folcher, she handles disciplinary issues and performance reviews, and attends the meetings with employees. Prior to June 27, *Page 9 
2006, Ms. Kornegay testified that plaintiff had been counseled on numerous occasions for disciplinary issues, concerning complaints from her employees.
31. Ms. Kornegay testified that she did not witness plaintiff suffer an injury on June 20, 2006, and plaintiff did not report an alleged injury to her that day. Ms. Kornegay testified she was present on June 20, 2006, the day plaintiff claims she was injured. She stated plaintiff did not lift the heavy dog as she alleges, and would not be required to do so in her position. Plaintiff worked her regular duty job full-time until June 27, 2006. Ms. Kornegay testified that she observed plaintiff on a daily basis during that period, and plaintiff never appeared to be injured, or reported that she was in pain.
32. Ms. Kornegay also testified that on June 27, 2006, she and Mr. Folcher held a disciplinary meeting with plaintiff to discuss plaintiff's continued complaints by her salon employees. At the meeting, plaintiff was informed that she would be required to either accept a demotion to pet stylist at a new store, or be terminated from further employment with Petsmart. Plaintiff was also asked to sign a disciplinary form confirming the meeting, and refused to do so. Plaintiff was provided 24 hours to make her decision. Ms. Kornegay noted that during the meeting plaintiff did not exhibit any physical limitations, or report her alleged injury.
33. Natalie Kurtz, testified that she is the current salon manager at the Capital Boulevard Petsmart location. Ms. Kurtz has held the position since January 2007. Prior to that, she was employed as a pet stylist and worked under Ms. Biggerstaff.
34. Ms. Kurtz testified that she was present on June 20, 2006, the date plaintiff claims she was injured. She testified she did not see plaintiff injure herself as she alleges, and plaintiff continued working the remainder of her shift that day. Ms. Kurtz testified plaintiff did not appear to be injured, and she did not report any complaints of pain the remainder of her shift. In *Page 10 
addition, she continued working with plaintiff from June 20, 2006 through plaintiff's last day of employment on June 27, 2006. During that time, plaintiff never reported her alleged injury on June 20, 2006, nor did she appear to be injured.
35. The parties deposed Dr. Leonard Nelson on July 9, 2007 in Raleigh, North Carolina. The parties stipulated to Dr. Nelson's expertise in the field of orthopedic surgery. Dr. Nelson testified that there was no objective evidence at all to explain plaintiff's complaints of low back pain. Dr. Nelson testified that several factors, such as plaintiff's scoliosis and obesity, likely caused her symptoms rather than the alleged acute injury.
36. Dr. Nelson stated plaintiff was capable of returning to work in a sedentary position available following her initial evaluation, and was capable of returning to work without restrictions six to eight weeks after the alleged injury.
37. Dr. Nelson testified that the facts of this claim, and plaintiff's physical findings raised questions in his mind about the involvement of secondary gain in this case. Dr. Nelson testified that he was concerned that secondary gain was involved here based on the prospect of financial gain as a motivating factor for plaintiff in her workers' compensation claim.
38. Dr. Nelson testified that during the course of plaintiff's treatment, she was not "in the mood to listen to me tell her she could return to work." He testified that plaintiff had a "fairly high anger level" directed towards her employer. Dr. Nelson stated plaintiff's anger and bitterness towards her employer, and the fact that she was involved in a denied workers' compensation claim were also factors suggesting plaintiff was engaged in secondary gain.
39. Defendants retained Allan Gorrod, an ergonomist, to evaluate and prepare an ergonomic report in regard to plaintiff's Salon Manager position with defendant-employer. Although Mr. Gorrod was unable to quantify what amount of vibration is necessary to increase *Page 11 
exposure to conditions consistent with cumulative trauma, as plaintiff has alleged, he expressed in his report that the duties of a Salon Manager did not place persons employed in the positions at "increased exposure to conditions consistent with cumulative trauma." However, the Full Commission finds that Mr. Gorrod mistakenly believed that approximately forty percent (40%) of the plaintiff's duties were clerical in nature, when the greater weight of the evidence shows that approximately ninety percent (90%) of plaintiff's duties involved "hands-on" grooming of animals. In his testimony, Mr. Gorrod stated that he knew nothing about plaintiff or how she performed her work, and acknowledged that if plaintiff's duties involved more grooming than he had originally understood, the job would place her at greater risk of developing a cumulative trauma disorder, such as bilateral carpel tunnel syndrome, than was shown in his report. Also, the Full Commission finds that Mr. Gorrod observed defendant-employer's groomers on, what the record shows, to be a slow day. Therefore, the work observed by Mr. Gorrod did not accurately reflect the typical work or the typical pace of the work performed by plaintiff.
40. Defendants also retained George s. Edwards, Jr., M.D., to review plaintiff's medical records, job descriptions, and the ergonomic report by Mr. Gorrod. Dr. Edwards expressed the opinion that plaintiff's employment with defendant-employer did not cause or significantly aggravate plaintiff's bilateral carpal tunnel syndrome. He also expressed the opinion that plaintiff's employment did not place plaintiff at an increased risk of developing carpal tunnel syndrome as compared to members of the general public.
41. Dr. Edwards and Dr. Krakauer, plaintiff's treating physician, are equally experienced and qualified to offer expert opinion evidence regarding the cause of carpal tunnel syndrome and whether an employment places an employee at an increased risk of developing that condition as compared to members of the general public not so employed. In reviewing the *Page 12 
testimony of each physician in this matter, the Full Commission gives greater weight to the Opinions of Dr. Krakauer as opposed to Dr. Edwards. The Full Commission finds that Dr. Edwards opinions were based in part on Mr. Gorrod's report, which inaccurately represented that plaintiff performed clerical duties for forty percent (40%) of her day. Finally, Dr. Edwards never examined or evaluated plaintiff.
42. Conversely, Dr. Krakauer was of the opinion that plaintiff's employment with defendant-employer caused or significantly aggravated plaintiff's bilateral carpal tunnel syndrome. He also expressed the opinion that plaintiff's employment placed her at an increased risk of developing bilateral carpal tunnel syndrome as compared to members of the general public. The Full Commission finds that Dr. Krakauer, as plaintiff's treating physician, personally examined an evaluated plaintiff. Further, Dr. Krakauer testified that he was aware of the duties of a dog groomer, including exposure to vibrating clippers, and the hand, wrist, and arm motions necessary to perform those duties. In addition, Dr. Krakauer was aware that plaintiff's grooming duties consumed approximately 85 to 90% of her work day, as opposed to 40 to 60%, as assumed by Dr. Edwards and Mr. Gorrod.
43. Based on the greater weight of the evidence of record, the Full Commission finds that plaintiff's employment with defendant-employer significantly contributed to her development of bilateral carpal tunnel syndrome. Further, plaintiff's employment placed her at an increased risk of developing bilateral carpal tunnel syndrome as compared to members of the general public.
44. Based upon a review of the record in this matter, the Full Commission finds that as a result of plaintiff's work-related bilateral carpal tunnel syndrome, plaintiff was incapable of earning wages from defendant-employer or any other employer from June 28, 2006, through the *Page 13 
date of hearing before the Deputy Commissioner and continuing. There is no evidence of record that plaintiff had reached maximum medical improvement as of the date of hearing before the Deputy Commissioner or the close of the record in this matter.
45. The Full Commission finds that all medical treatment, examinations, and evaluations received by plaintiff for her hands, wrists and arms were reasonably necessary to effect a cure, provide relief, or lessen her period of disability.
46. Based on the greater weight of the evidence of record, the Full Commission finds that plaintiff has failed to establish that she sustained a compensable injury by accident to her back or a specific traumatic incident arising out of and in the course of her employment with defendant-employer on or about June 20, 2006.
47. Based on the Form 22 filed with the Commission, plaintiff had an average weekly wage of $1,117.13, which would yield a weekly compensation rate of $744.79; however, the maximum weekly compensation rate for 2006, the year of plaintiff's injury, is $730.00.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has shown through the greater weight of the evidence of record that her bilateral carpal tunnel syndrome is due to causes and conditions that were characteristic of and peculiar to her employment with defendant-employer and is, thus, an occupational disease. N.C. Gen. Stat. § 97-53(13). *Page 14 
2. Plaintiff is entitled to receive payment of temporary total disability compensation at the weekly rate of $730.00 from June 28, 2006, and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to receive payment of all past and future medical expenses incurred for the treatment of her bilateral carpal tunnel syndrome that is reasonably required to effect a cure, give relief, or lessen the disability. N.C. Gen. Stat. §§ 97-2(19), 97-25, and97-25.1.
4. Plaintiff has failed to establish, through the greater weight of the evidence of record, that she sustained a compensable injury by accident to her back or a specific traumatic incident arising out of and in the course of her employment with defendant-employer on or about June 20, 2006. N.C. Gen. Stat. § 97-2(6).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall provide to plaintiff temporary total disability compensation at the weekly rate of $730.00 from June 28, 2006, and continuing until further order of the Commission, subject to the attorney's fee provided herein. Compensation that has accrued shall be paid to plaintiff in a lump sum.
2. Defendants shall provide to plaintiff payment of all past and future medical expenses incurred for the treatment of her bilateral carpal tunnel syndrome that is reasonably required to effect a cure, give relief, or lessen the disability.
3. Defendants shall pay directly to plaintiff's counsel a reasonable attorney's fee in the amount of twenty-five (25%) of the compensation awarded herein. Fees bases upon *Page 15 
compensation that has accrued shall be paid to plaintiff's counsel in a lump sum; thereafter, defendants shall directly to plaintiff's counsel every fourth check of compensation due to plaintiff.
4. Plaintiff's claim for an alleged injury by accident to her back or a specific traumatic incident arising out of and in the course of her employment with defendant-employer on or about June 20, 2006, is unsupported by the evidence of record and is, thus, hereby DENIED.
5. Defendants shall pay the costs, including expert witness fees of $525.00 to Dr. Leonard D. Nelson, and $775.00 to Dr. Joel D. Krakauer, if not paid by prior order.
This 28th day of April 2008.
S/___________________ CHRISTOPHER SCOTT COMMISSIONER
 CONCURRING: S/_____________ DANNY LEE McDONALD COMMISSIONER
CONCURRING IN PART AND DISSENTING IN PART:
 S/_______________ DIANNE C. SELLERS COMMISSIONER *Page 16